```
         IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THOMAS WARREN,                        :
                                      :
                 Plaintiff,           :   CIVIL ACTION
                                      :
     v.                               :   No. 14-cv-6249
                                      :
LENORA KING, ET AL.,                  :
                                      :
                 Defendants.          :
```

## MEMORANDUM

**JOYNER, J.**                                                     **April 27, 2016**

Before the Court are Defendants' Motion for Summary Judgment (Doc. No. 45), Plaintiff's Motion in Opposition thereto (Doc. No. 53), Plaintiff's Cross Motion for Partial Summary Judgment (Doc. No. 52), and Defendant's Response in Opposition thereto (Doc. No. 54). For the reasons given below, the Defendants' Motion is DENIED in part and GRANTED in part. The Plaintiff's Motion is DENIED. An Order follows.

### I. BACKGROUND

Plaintiff Thomas Warren was, at the time of the events in question, a resident at Coleman Hall, "a facility that provides residential reentry treatment services and houses Technical Parole Violators." Doc. No. 45 at 3 of 21. Mr. Warren maintains that he had the status of "parolee" during the relevant events. Compl. at ¶ 3. During the time Mr. Warren resided at Coleman Hall, Defendant Lenora King was a unit manager there and Defendant Fred Shapiro was the director. Compl. at ¶¶ 4-5.

Mr. Warren alleges that on October 3, 2013, at approximately

1:35 PM, Ms. King entered Mr. Warren's dorm bathroom. Compl. at ¶¶ 8-9. At the time, Mr. Warren was in a closed stall "removing his bowels." Compl. at ¶ 9. Two other residents of the dorm were washing up in the bathroom at the same time. Compl. at ¶ 9. Ms. King directed Mr. Warren to leave the bathroom. Compl. at ¶ 10. When Mr. Warren informed Ms. King that he was removing his bowels, Ms. King told Mr. Warren that if he did not come out of the bathroom he would not be re-paroled on October 7, 2013. Compl. at ¶ 11. Mr. Warren exited the bathroom stall without properly cleaning himself. Compl. at ¶ 12.

Ms. King pat searched Mr. Warren. Compl. at ¶ 13. She then radioed for staff backup and ordered two male staff members to strip search Mr. Warren. Compl. at ¶ 14. Mr. Warren alleges this took place in front of Ms. King and two other residents of Coleman Hall. Compl. at ¶ 15.

After the strip search, Ms. King took Mr. Warren into the hallway, where she told him he was in trouble with Mr. Shapiro and that if he did not tell her what was going on in the bathroom, Mr. Warren would not be re-paroled on October 7, 2013. Compl. at ¶¶ 17-19. Ms. King then had Mr. Warren taken to a detention room where Mr. Shapiro asked Mr. Warren to tell them what he knew. Compl. at ¶¶ 20, 22. When Mr. Warren stated that he did not know anything, Mr. Shapiro instructed Ms. King to terminate Mr. Warren from the Coleman Hall facility. Compl. at ¶ 23. Mr. Warren was told that

this was because he refused to "snitch." Id. When Mr. Warren asked if he would receive a hearing, as he understood to be standard procedure, "Defendant Shapiro told plaintiff Warren that life is not fair." Compl. at ¶ 24. A parole agent placed Mr. Warren in shackles and informed him that he was being arrested for contraband. Compl. at ¶ 26.

On October 7, 2013, Mr. Warren sent a grievance letter to Mr. Shapiro. Compl. at ¶ 35; Doc. No. 53, Ex. L, at 75 of 101. He did not receive a response. Compl. at ¶ 35. On October 29, 2013, Mr. Warren's parole was revoked by the Pennsylvania Board of Probation and Parole. Compl. at ¶ 30; Doc. No. 1, Ex. A, at 34 of 71. On November 1, 2013, Mr. Warren filed an Administrative Appeal to the Pennsylvania Board of Probation and Parole. Compl. at ¶ 36. He did not receive a response. Id.

On October 31, 2014, Plaintiff filed a *pro se* civil action against Ms. King and Mr. Shapiro under 42 U.S.C. § 1983.[1] He alleges violations of his Fourth, Eighth, and Fourteenth Amendment rights; he seeks declaratory, injunctive, compensatory, and punitive relief. Compl. at ¶ 43-46. Defendants moved for Summary Judgment on January 21, 2016; Plaintiff filed his response and Cross-Motion on March 21, 2016; Defendants filed their response in opposition on April 8, 2016.

## II. STANDARD OF REVIEW

---

[1] A third Defendant has not been served at the time of this Memorandum and Order.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material when its resolution 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Justofin v. Metropolitan Life Ins. Co., 372 F.3d 517, 521 (3d Cir. 2004) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In making this determination, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (alteration in original) (internal quotation and citation omitted). We hold a *pro se* plaintiff bringing a civil rights suit to a less stringent standard than a trained lawyer, and will liberally construe the plaintiff's allegations. Nieves v. Dragovich, No. CIV.A. 96-6525, 1997 WL 698490, at *1 (E.D. Pa. Nov. 3, 1997).

### III. DISCUSSION

#### A. Failure to Exhaust Remedies

The Prison Litigation Reform Act of 1995 ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in a jail, prison, or other

4

correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Defendants argue that Mr. Warren's claims must be dismissed for failure to exhaust administrative remedies. The burden is on the Defendants to show that Mr. Warren "failed to meet the requirements of the grievance process" in place. Brown v. Lewis, 865 F.Supp.2d 642, 646-47 (E.D. Pa. 2011) (internal citation omitted).

The Defendants claim that Mr. Warren failed to follow the Coleman Hall grievance procedure outlined in the Resident Handbook. He did not follow it at the time of the events in question and upon his return to Coleman Hall in March 2014, they argue, he had another opportunity to file a grievance and he failed to do so. Additionally, while Mr. Warren claims he wrote a letter explaining his grievances to Mr. Shapiro, the Defendants argue there is no evidence the letter was mailed, or that it was received by Mr. Shapiro.

The grievance procedure of Coleman Hall requires residents to complete a grievance form, which is "available on the housing unit," and place it in a grievance box. Doc. No. 45-2, Ex. B, at 16 of 30. After his removal from Coleman Hall, Mr. Warren lacked access to both the form and the box. The procedure indicates it is for "[r]esidents experiencing problems with the program" and that filing a grievance "will not interfere with a resident's status or progress in the program." Id. Thus the procedure appears to be for current residents, not individuals who had been terminated from the

5

program. As Mr. Warren's grievance involved his termination from the program and not conditions within the program, it is not clear that these procedures apply to him. Additionally, as the Defendants themselves indicate, this grievance procedure was not available to Mr. Warren because he no longer resided at Coleman Hall and was terminated before he had an opportunity to file a grievance. "A grievance procedure is not available even if one exists on paper if the defendant prison officials somehow prevent a prisoner from using it." Alden v. Smith, No. 3:CV-05-1735, 2007 WL 776868 (M.D. Pa. Mar. 12, 2007) (citing Mitchell v. Horn, 318 F.3d 523, 529 (3d Cir. 2003)); See also Brown v. Croak, 312 F.3d 109, 112-13 (3d Cir. 2002) ("Section 1997e(a) only requires that prisoners exhaust such administrative remedies 'as are available' ... ."). Accordingly, we find that the Defendants did not meet their burden to show that there is no genuine dispute as to whether Mr. Coleman exhausted his available administrative remedies.

### B. No Physical Injury

The PLRA provides the following limitation on recovery: "No federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act ... ." 42 U.S.C. § 1997e(e). The Defendants allege that Mr. Warren can claim no damages because he has not indicated that he suffered any physical injuries as a result of this alleged incident. Mr. Warren

does not contest that he claims no physical injury, but instead claims he is entitled to recover certain damages nonetheless.

It is well settled that "Section 1997e(e)'s requirement that a prisoner demonstrate physical injury before he can recover for mental or emotional injury applies only to claims for compensatory damages." Mitchell, 318 F.3d at 533. Claims seeking nominal or punitive damages, or seeking injunctive or declaratory relief, for violations of constitutional rights may proceed without claim of any physical injury. Id. Mr. Warren seeks declaratory and injunctive relief, and both punitive and compensatory damages. Compl. at ¶¶ 43-46. Accordingly, we grant summary judgment to the Defendants on the issue of Mr. Warren's compensatory damages, but deny their claim that he has alleged no damages, as he remains entitled to claim declaratory and injunctive relief, as well as punitive damages, without claiming physical injury.

### C. Due Process Violation

The Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property without due process of law ... ." U.S. CONST. amend. XIV, § 1. This protects incarcerated individuals, who "retain certain constitutionally protected property and liberty interests." Fantone v. Lantini, 780 F.3d 184, 185 (3d Cir. 2015). However, "a prisoner does not have a liberty interest in remaining in a preferred facility within a state's prison system." Asquith v. Dep't of Corr., 186 F.3d 407, 410 (3d Cir. 1999). The protections of the Fourteenth Amendment also apply

to parolees in that the power of the state to detain and recommit parolees is subject to its constraints. See U.S. ex rel. Burgess v. Lindsey, 395 F.Supp. 404, 407 (E.D. Pa. 1975). In order to determine the relevant interests and the process necessary to protect those interests, we must first determine whether Mr. Warren was a prisoner or a parolee at the time in question.

Under Pennsylvania law, a technical parole violator ("TPV") is a parolee "who violates the terms and conditions of his parole" other than by being convicted of a new crime. 61 Pa.C.S.A. § 6138(c). Unless certain conditions are met, a TPV is to be detained and recommitted "in a community corrections center or community corrections facility." Id. Coleman Hall is such a facility and Mr. Warren was committed there as a TPV. Defendants point to the fact that Mr. Warren was detained and recommitted as a TPV as conclusive that he was a "convicted inmate," and not a parolee. Doc. No. 45 at 11 of 21. Mr. Warren points to the language in the statute referring to a "parolee" even after a violation has occurred, as well as to the "Record of Interview" from the Pennsylvania Board of Probation and Parole, which refers to Mr. Warren as a "parolee" during the time of detention at Coleman Hall, as evidence to the contrary. See Doc. No. 53, Ex. A, at 26 of 101.

As Mr. Warren notes, the statute refers to a TPV as a parolee. Although the statute indicates that a TPV is to be detained and recommitted, crucially, it does not state that detention and recommitment strip a TPV of his or her parolee status.

Additionally, Chapter 50 of Title 61 of the Pennsylvania Statutes indicates that "a parolee under the jurisdiction of the board" who is detained or recommitted may be housed in a community corrections center or community corrections facility. 61 Pa.C.S.A. § 5003.

Contrary to the Defendants' assertion, that an individual is detained is also not conclusive on the issue of whether that individual has the status of a parolee. In the context of determining whether to grant a reincarcerated individual credit for time served in a treatment program, the Pennsylvania Supreme Court has looked to the conditions of confinement to determine whether or not an individual can be considered to be "at liberty on parole." Cox. v. Com., Bd. of Probation and Parole, 493 A.2d 680, 618-20 (Pa. 1985). This is a fact-specific inquiry. Id. at 619. In Medina, the Pennsylvania Supreme Court let stand the Board of Probation and Parole's determination that Mr. Medina's 79-day stay at a Community Corrections Facility ("CCF") was time spent at liberty on parole. Medina v. Pa. Bd. of Probation and Parole, 120 A.3d 1116, 1125 (Pa. 2015). The Board noted that although the CCF housed pre-released inmates as well as parolees, the treatment of the parolees differed from the pre-release inmates. Id. at 1117-18. In particular, the parolees were never charged with escape if they left the premises and failed to return, although they were still considered to be absconders. Id. at 1118.

In Medina, the plaintiff was paroled from prison to the CCF. Mr. Warren was detained at Coleman Hall (which is also a CCF) after

9

he violated the terms of his parole and he apparently did not come to Coleman Hall directly from prison. The issue here is not whether Mr. Warren's time at Coleman Hall constituted incarceration for purposes of receiving credit for time served, but the time served cases are useful in that they tell us it is possible to be detained at a CCF and not be considered an inmate. As in those cases, we look to the facts in the record to ascertain Mr. Warren's legal status.

Mr. Warren was housed in the Serenity Unit at Coleman Hall, and at the time in question his assigned program was "CPC-Secure/CBLS." Doc. No. 45-7, Ex. G. There is scant evidence in the record, however, on how much freedom Mr. Warren had. Coleman Hall appears to house TPVs with permission to leave the premises and TPVs without such permission. See Doc. No. 45-2, Ex. B., at 29 of 30 (noting that some TPVs have authorized absences). Defendants note that Mr. Warren absconded on two occasions. Doc. No. 53, Ex. D, at 43 of 101. We do not know if this was reported, if it was easy for him to abscond (for example, because he was at liberty to leave and failed to return), or if Defendants were erroneously referring to events that took place at a different time. See Doc. No. 45-7, Ex. G (indicating Mr. Warren absconded from Coleman Hall on May 31, 2014 and June 2, 2014). All of these uncertainties leave open the possibility that he had the kinds of freedoms typical of a parolee, and not an inmate.

We note that a detained individual residing in "a strictly

monitored halfway house" with limited freedoms has been considered under institutional confinement by the Third Circuit. See Asquith, 186 F.3d at 411. In Asquith, the court noted that the "implicit promise" that comes with parole, that the limited freedoms will not be arbitrarily revoked, was absent. Id. In contrast, here, there were procedures in place to protect Mr. Warren's limited freedom. See Doc. No. 45-2, Ex. B, at 19-20 of 30.

We also look to the actions of the Pennsylvania Board of Probation and Parole ("Parole Board") to determine whether Mr. Warren was still considered a parolee when they recommitted him to prison. The Parole Board "is vested with exclusive jurisdiction to grant, revoke, or reinstate parole." Robinson v. Largent, 311 F.Supp. 1032, 1033 (E.D. Pa. 1970). On October 29, 2013, the Parole Board recommitted Mr. Warren as a TPV to "a state correctional institution/contracted county jail" to serve six months. Doc. No. 1 at 34 of 71. It is not clear whether this decision formally revoked Mr. Warren's parole, or whether it merely affirmed a previous determination and transferred him from one detention facility to another. There is no indication in the record before us, however, that the Parole Board formally revoked Mr. Warren's status prior to October 29, 2013.

For the foregoing reasons, we find that there exists a genuine dispute as to whether Mr. Warren was a prisoner or parolee at the time in question.

Nevertheless, the Defendants will meet their burden on the due

11

process claim if they can show that there is no genuine dispute as to whether Mr. Warren was accorded the process due to a parolee by the Defendants. The Supreme Court has held that "the full panoply of rights due a defendant in [a criminal] proceeding does not apply to parole revocations." Morrissey v. Brewer, 408 U.S. 471, 480 (1972). A parolee is entitled, however, to a preliminary hearing to determine whether probable cause or reasonable ground exists to revoke his parole, and to a revocation hearing, in which the parolee will be granted an opportunity to be heard in person, present evidence, and confront and cross-examine adverse witnesses, among other guarantees. Id. at 484-89. The revocation hearing must be held within a reasonable amount of time after the parolee is taken into custody. Auman v. Com., Pa. Bd. Of Probation and Parole, 394 A.2d 686, 688 (Pa. 1978).

According to the Coleman Hall Resident Handbook, a person accused of violating a "major prohibited act" or a "major rule or procedural infractions" will be scheduled for a hearing. Doc. No. 45-2, Ex. B, at 19 of 30. It appears this procedure is followed, at least in some cases, as evidenced by the affidavits from other residents of Coleman Hall. Doc. No. 53, Ex. G, at 57-58 of 101. The Defendants indicate that Mr. Warren was scheduled for a hearing for the alleged violations that took place on October 3, but that he was removed from custody by the Parole Board before the hearing could occur. Doc. No. 45 at 8 of 21. Indeed, he was removed from Coleman Hall within hours of the alleged incident. The Defendants

informed the Parole Board of the incident immediately, and prior to any hearing taking place. The report submitted apparently to Mr. Warren's parole supervisor indicates that Mr. Warren was removed from Coleman Hall at 4:12 PM on October 3, as an "unsuccessful discharge, program failure." Doc. No. 53, Ex. J, at 69 of 101. It states that Mr. Warren "had multiple infarctions [sic] and failed to report serious contraband." Id. This "failure to report" allegation apparently refers to the incidents that occurred a few hours earlier.

The Letter of Termination indicates that the decision to discharge Mr. Warren from Coleman Hall was made, at least in part, by Defendant King, as she is one of two signatories. Doc. No. 45-3, Ex. C, at 2 of 4. The letter indicates that two infractions from August,[2] plus the events of October 3, led to Mr. Warren's termination. Because Mr. Warren was scheduled to be released from Coleman Hall on October 7 and the paperwork for that release was already signed,[3] it appears that had the events of October 3 not occurred, he would not have been terminated from the program. See Doc. No. 45 at 10 of 21. Mr. Warren also alleges facts in his Complaint that indicate Mr. Shapiro played a role in the decision to terminate him from the program without a hearing. Compl. at ¶¶

---

[2] Mr. Warren states that these earlier infractions were for sleeping while group was in progress and obscene language. Doc. No. 45-4, Ex. D, at 9 of 12.

[3] Coleman Hall only releases residents on Mondays and Tuesdays. Mr. Warren was approved to be released already by October 3 and was waiting for the following Monday to effectuate his release.

13

22-24, 39.[4]

The Defendants argue that they did not send Mr. Warren away; instead, the decision to take Mr. Warren away and, subsequently, to revoke his parole, was made entirely by the Parole Board. However, the notification given to the Parole Board, rather than having "nothing to do with the Parole Board extracting the Plaintiff hours after the event," as the Defendants claim, in fact prompted his physical removal several hours later. See Doc. No. 45 at 8 of 21. Tort defendants, including those sued under section 1983, are "responsible for the natural consequences of [their] actions." Malley v. Briggs, 475 U.S. 335, 344 n.7 (1986) (internal quotation and citation omitted). Further, the Defendants' assertion that Mr. Warren was *scheduled* for a hearing has no bearing on whether he received his due process. He was entitled to a hearing on the facts underlying his parole revocation, and that requirement is not satisfied by scheduling a hearing that never occurs.

While it appears that Ms. King's account of the events on October 3 led to Mr. Warren being removed from Coleman Hall, it is not clear what role Ms. King's account of what happened on October 3 played in the actual termination of Mr. Warren's parole. On October 29, 2013, the Parole Board recommitted Mr. Warren as a TPV

---

[4] Defendants argue that Mr. Warren is attempting to allege a *Monell* claim. We do not read the complaint that way, keeping in mind the more lenient standard to be applied to a *pro se* prisoner. We find Mr. Warren has alleged facts from which a reasonable jury could connect the alleged violations to the behavior of Ms. King and Mr. Shapiro.

to "a state correctional institution/contracted county jail to serve 6 months, pursuant to Act 122 of 2012." Doc. No. 1, Ex. A, at 34 of 71.[5] The Notice of Board Decision indicates that Mr. Warren had multiple technical violations: Violation of Condition #5A, Use of Drugs; Violation of Condition #7, Failure to Successfully Complete the Gaudenzia Diagnostic and Rehab Community Corrections Facility Program, and that he admitted to these violations. Id. It also stated the following reasons for recommitting him to prison: "not amenable to parole supervision, pattern of parole failure in your criminal history, failure to comply with sanctions, violations established." Id. It is not clear whether the drug use violation grounding his parole revocation was based on the events of October 3, events that occurred prior to that day while Mr. Warren resided at Coleman Hall, or were the same parole violations that led to him being detained to Coleman Hall in the first place. Regardless, it seems his termination from Coleman Hall influenced the Parole Board's decision to revoke his parole.

It is not clear whether Mr. Warren had been given an opportunity to dispute Ms. King's account of what happened on October 3. He claims he never received a hearing before the Parole Board. The Defendants claim that he did. This is a genuine dispute of a material fact. Even if he did receive a hearing, it is possible that Mr. Warren admitted that he was terminated from the

---

[5] Act 122 of 2012 updated the statute concerning violation of terms of parole, and is codified under 61 Pa.C.S.A. § 6138.

15

program at Coleman Hall without having an opportunity to refute the charges that resulted in that termination, and that the fact of his termination on its own, without regard to the reasons behind it, influenced the decision to recommit him. In other words, that his parole was revoked because he was terminated from Coleman Hall, and that he was terminated from Coleman Hall for alleged violations he never was able to refute or question. We believe this would constitute a due process violation.

We find there is a genuine dispute of material facts on the due process claim which precludes summary judgment to be entered on behalf of the Defendants. Mr. Warren also moved for summary judgment on the due process issue. Because there is a genuine dispute as to whether he was a parolee and whether he received a hearing to refute the claims against him, we deny his motion as well.

### D. Eighth Amendment Violation[6]

The Eighth Amendment prohibits unnecessary and wanton inflictions of pain, which "are those that are totally without penological justification." Hope v. Pelzer, 536 U.S. 730, 737

---

[6] Mr. Warren alleges that his encounter with Ms. King constitutes both an Eighth Amendment and a Fourth Amendment violation. The Defendants argue generally that "none of these claims constitute a constitutional violation under the law" and cite only Zullinger to support their claim. Doc. No. 45 at 14-17 of 21. Because in our analysis of the Eighth Amendment claim we find the facts of Zullinger to be substantially dissimilar, and the Defendants have failed to specifically address the Fourth Amendment law implicated, we deny their motion for summary judgment on Mr. Warren's Fourth Amendment claim.

16

(2002) (internal quotation and citation omitted).[7] This involves a subjective component, which looks to whether the official acted with a culpable state of mind, and an objective component, which looks to the severity of the harm. Hudson v. McMillian, 503 U.S. 1, 21 (1992). The objective component "is contextual and responsive to contemporary standards of decency." Id. at 8 (internal quotation and citation omitted). Mr. Warren claims that his strip search in front of Ms. King and two other parolees, his being forced out of the restroom stall before being able to clean himself, and his pat search by Ms. King violated his Eighth Amendment rights.

Several circuit courts have found that, in certain circumstances, prisoner nudity can constitute cruel and unusual punishment under the Eighth Amendment. See Solan v. Ranck, No. 1:CV-06-0049, 2007 WL 4111424, at *7-8 (M.D. Pa. Nov. 16, 2007) (citing cases from various circuit courts). The "basic right of privacy" is implicated when a prisoner is forced to be unclothed. Id. at *9. The court in Solan found that deliberately displaying a prisoner's naked body, to both males and females, satisfied both the objective and subjective components of the Eighth Amendment when done to humiliate the prisoner. Id. Although the Third Circuit has not ruled on this issue, we agree with these circuit courts and our sister court that found "unnecessary nakedness" with no

---

[7] Although the parties dispute whether Mr. Warren was imprisoned while at Coleman Hall, both parties cite cases involving punishments that take place in prisons and we analyze this claim under the same framework as the prison cases.

penological justification can be a viable Eighth Amendment claim. Id. at *9.

Defendants point to Zullinger to support their argument that there was no Eighth Amendment violation against Mr. Warren. Zullinger v. York County CCC Halfway House, No. 1-10-cv-1450, 2013 WL 2434585 (M.D. Pa. June 3, 2013). In Zullinger, the plaintiff alleged that female staff members monitored as he urinated for a drug test. Id. at *7. The court noted that he remained fully clothed while he urinated and that the testing was "a necessary and reasonable component to support the safety of the staff and those incarcerated." Id. The court found neither the objective nor the subjective components of an Eighth Amendment claim were met.

The issue here is not urination, but rather complete nudity. Both sexes have an interest in "[s]hielding one's unclothed figure from the view of strangers." Michenfelder v. Sumner, 860 F.2d 328, 333 (9th Cir. 1988). Mr. Warren alleges he was strip searched by two male staff, and that Ms. King stayed in the room, as did two other residents of Coleman Hall. In Calhoun, the Seventh Circuit found that a strip search of a male inmate in front of female guards could constitute an Eighth Amendment violation when done with no penological justification. Calhoun v. DeTella, 319 F.3d 936, 940 (7th Cir. 2003). While the Defendants here claim that there was probable cause to search Mr. Warren, that he was believed to have drugs on his person in the bathroom, there does not appear to be a reason for the strip search to have occurred in the

18

presence of Ms. King and the two residents. This would serve no penological purpose and would increase the embarrassment of Mr. Warren.

The Coleman Hall Administrative Policy and Procedure Manual does not clearly indicate Coleman Hall's policy on the presence of female staff when males are unclothed. Of the pages submitted by Mr. Warren, the first indicates it is 1 of 3 and the second is 9 of 33, so they appear to be from different sections. Doc. No. 53, Ex. C, at 31-34 at 101. They are contradictory; for example, the first page indicates that body cavity searches are never permitted whereas the second page indicates that body cavity searches must be done by staff of the same gender unless an exigent circumstance exists. Id. In their answer to Mr. Warren's interrogatories, Defendants state that female staff are not permitted to pat search male residents. Doc. No. 53, Ex. D, at 40-41 of 101. However, it also appears that Coleman Hall policy may allow an exception for both strip and pat searches when "exigent circumstances" so require. Doc. No. 53, Ex. C, at 32 of 101. This leaves the official policy of Coleman Hall unclear.

The Defendants offer no legal argument that a pat search by a member of the opposite sex or forcing Mr. Warren to leave the restroom stall without cleaning himself could not constitute an Eighth Amendment violation. As this is a fact-specific and contextual determination, we find they have not met their burden on these issues. We also find that there is a genuine dispute as to

whether Mr. Warren was strip searched in front Ms. King and two other residents of Coleman Hall, and whether there was justification for it. These determinations could constitute an Eighth Amendment claim. Therefore, we deny the Defendants' motion for summary judgment on the Eighth Amendment claim.[8]

### IV. CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment is granted in part and denied in part, and the Plaintiff's Cross Motion for Summary Judgment is denied. An Order follows.

---

[8] Defendants claim that because Ms. King did not perform the strip search, she cannot be held accountable for it taking place in her presence. Mr. Warren alleges that Ms. King "ordered" his strip search to take place in front of her and the other residents. See Doc. No. 53 at 5 of 101. Therefore, this claim is properly brought against her.